## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL DOBSON, individually and as
a representative of a class of similarly
situated borrowers,

                      Plaintiff,

vs.

PNC BANK, N.A. and AMERICAN
SECURITY INSURANCE COMPANY,

                      Defendants.

Civil Case No.:

**CLASS ACTION COMPLAINT
AND DEMAND FOR JURY
TRIAL**

Plaintiff Michael Dobson, on behalf of himself and as a representative of a class of similarly situated borrowers, brings the claims set forth below against PNC Bank, N.A. ("PNC") and American Security Insurance Company ("ASIC") (collectively, "Defendants").

### NATURE OF THE ACTION

1.    Plaintiff and members of the Class (as defined below) have or had loans or lines of credit owned, originated, and/or serviced by PNC secured by their property and were charged for "force-placed" flood insurance pursuant to exclusive agreements between PNC and ASIC that returned significant  financial benefits to PNC unrelated to any contractual or other *bona fide* interest in protecting PNC's interest in the loan or the property, resulting in unauthorized and unfairly inflated costs to borrowers in violation of

the law and the underlying mortgages.

2.     Throughout the proposed Class Period (defined below) PNC would replace borrowers lapsed insurance policies with "force-placed" or "lender-placed" insurance and would "force-place" duplicative and unnecessary flood insurance on borrowers . Such policies offer less coverage, are substantially more expensive, and provide lucrative financial benefits to PNC and ASIC.

3.     PNC exploited its contractual authority to force-place insurance in order to reap additional profits in the form of unjustified commissions and other forms of consideration at the expense of borrowers whose insurance was force-placed. Sometimes the consideration was disguised as reimbursements for certain costs or was a percentage of the force-placed premiums, subsidized or discounted administrative services, or lucrative captive reinsurance deals. These improper benefits were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the mortgaged property.

4.     PNC charges borrowers for the "cost" of procuring force-placed insurance, but a portion of this purported "cost" is returned, transferred or paid back to PNC and/or its affiliated entities.

5.     ASIC also benefitted financially from the force placed insurance practices at issue in this case. As alleged below, ASIC engaged in similar force placed practices with other lenders and services, including Chase, HSBC, Ocwen, Wells Fargo and Nationstar.

6.     Among other things, Plaintiff and members of the Class seek to recover

treble damages under RICO, or, in the alternative, damages equal to the amount of the improper and inequitable financial benefit received by PNC and/or its affiliates and by ASIC as a result of this anti-consumer and predatory practice.

7.     The premiums paid by and/or assessed to Plaintiff and members of the Class also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing the loans. The percentage of borrowers who were charged for force-placed insurance were shouldering the costs of monitoring PNC's entire loan portfolio – effectively providing kickbacks to PNC in the form of below-market, outsourced insurance services.

8.     As one journalist observed of the industry:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.
>
> Policies are sometimes backdated to cover periods that have already passed. In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star Telegram (June 12, 2012), available at https://watchdognation.com/force-placed-insurance-mortgage/.

9.     Recently, regulatory authorities around the country have started to investigate

the forced-placed insurance practices of lenders and servicers like PNC and insurance companies like ASIC. For example, the New York State Department of Financial Services ("NYSDFS") convened hearings in 2012 to investigate the force-placed insurance industry. On the opening day of these hearings, NYSDFS Superintendent Benjamin Lawsky ("Superintendent Lawsky") noted that his department's initial inquiry uncovered "serious concerns and red flags" which included: (a) exponentially higher premiums for force-placed insurance than regular insurance; (b) extraordinarily low loss ratios; (c) harm to distressed borrowers; (d) lack of competition in the market; (e) increased reliance on force-placed insurance as a major profit center for both banks and insurers; and (f) "tight relationships between banks, their subsidiaries and insurers." *See* generally Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services (May 17, 2012), attached hereto as Exhibit A.

      10.    As Superintendent Lawsky summarized:

> In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those big profits revert right back to the banks through reinsurance agreements.

    \* \* \* \*

> In sum, when you combine this close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions that we need to explore in these hearings.

*Id.* at page 3.

11.     These 2012 hearings investigated the FPI practices of banks, mortgage loan servicers, and insurance providers, providers including defendant ASIC. *See Under Interrogation*, Am. Banker (Jan. 27, 2012, 5:03pm ET), http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html.

12.     Consumer advocates at these hearings stated that force-placed insurance usually costs the borrower more than the price of regular insurance, and Mr. Lawsky noted that insurers paid an exceptionally low loss ratio of around less than 25 cents in claims for every dollar of premium they received. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. Times (May 21, 2012), http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-insurer-payments-to-banks.html;

13.     In response to these hearings, New York Governor Andrew M. Cuomo stated that his administration would continue to investigate the "lack of competition, high prices, and low loss ratios and take necessary steps to clean up this market." *Id.*

14.     In addition, the National Association of Insurance Commissioners ("NAIC") – the lead national insurance regulatory organization created and governed by the chief insurance regulators from all 50 states that is charged with establishing standards and best practices, conducting peer reviews, and coordinating regulatory oversight – began investigating force-placed insurance practices and held public hearings on August 9, 2012 to look into the force-placed insurance practices of banks, insurers and their partners. *See*

Mark E. Ruquet, *NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules*, PropertyCasualty360.com/2012/08/10/naic-promises-greater-focus-on-forc-placed-insura (Aug. 10, 2012).

15.     Throughout the Class Period (defined below), Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including: (a) improperly exploiting the ability to manage and gain access to lines of credit and/or escrow accounts in order to exact payment for inflated force-placed insurance premiums that included unlawful kickbacks; (b) forcing insurance on borrowers arranged through pre-designated providers of force-placed insurance at a substantially higher cost to the borrower; (c) charging Plaintiff and members of the Class amounts for force-placed insurance, which were inflated by unreasonable expenses unrelated to the provision of the insurance and that result from collusion among affiliates and/or providers involved in the process; (d) receiving fees, payments, commissions and other things of value from providers of force-placed insurance; (e) misrepresenting that PNC was force-placing insurance on Plaintiff's and Class members' properties to secure PNC's interests, and omitting to inform Plaintiff and Class members that PNC was force-placing insurance to generate an unreasonable and unwarranted profit for PNC and ASIC; and (f) conspiring to take advantage of their contractual authority to force-place insurance on Plaintiff and the Class members in order to return an undisclosed and improper financial benefit to Defendants.

16.     Based on Defendants' conduct as described herein, Plaintiff asserts claims

for (a) violating the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 ("RICO"); (b) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (c) Breach of the Duty of Good Faith and Fair Dealing against PNC; (d) Unjust Enrichment against PNC; and (e) Unjust Enrichment against ASIC.

17.     Plaintiff and the Class seek injunctive relief, corresponding declaratory relief, monetary relief, treble damages under RICO, and other appropriate relief for Defendants' unlawful conduct, as described herein.

## THE PARTIES

### A.     <u>Plaintiff</u>

18.     Plaintiff Michael Dobson resides in Butler, Pennsylvania and is a member of the Class.

19.     Plaintiff purchased his home in Butler, Pennsylvania with a loan that is now owned or serviced through PNC and/or its affiliated entities (including PNC Mortgage).

20.     Plaintiff was force-placed with flood insurance by Defendants as alleged below.

### B.     <u>PNC, Its Subsidiaries, and Affiliated Entities</u>

21.     Defendant PNC Bank, N.A. is a national banking association with its headquarters in Pittsburgh, Pennsylvania. PNC operates throughout the country, including in this District.

22.     PNC conducted many of the activities at issue in this Complaint through PNC Mortgage, a division of PNC.

C.     **ASIC**

23.    Defendant ASIC is a Delaware corporation with its principal place of business in Atlanta, Georgia. It does business nationwide, including in this District.

24.    ASIC was the insurer on the policies that PNC force-placed on Plaintiff.

**JURISDICTION AND VENUE**

25.    This Court has federal question jurisdiction over Plaintiff's RICO claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

26.    This Court also has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiff is a citizen of Pennsylvania and Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members of the Class.

27.    Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

28.    Alternatively, this Court has personal jurisdiction over Defendants because Defendants are engaged in systematic and continuous business activities in Pennsylvania, have sufficient minimum contacts in Pennsylvania, and/or otherwise intentionally avail

themselves of the Pennsylvania consumer market. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants appropriate under traditional notions of fair play and substantial justice.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Plaintiff resides in this District, the property on which Defendants force-placed insurance is in this District, Defendants regularly conduct business in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

A.    **Background**

30.     As is typical of mortgagees, PNC requires borrowers to purchase and agree to maintain flood insurance coverage on their secured property.

31.     To ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance. The amounts disbursed for the procurement of such insurance becomes additional debt secured by the mortgage.

32.     Plaintiff's and Class members' mortgage agreements do not disclose that PNC has an exclusive arrangement with ASIC to manipulate the force-placed insurance market and artificially inflate the premiums that ASIC and PNC charge to borrowers for force-placed insurance. The mortgage agreements do not disclose that the premiums are inflated to provide kickbacks and other financial benefits to PNC and its affiliates, often disguised as commissions or reimbursement of expenses, and to cover the cost of

discounted services, or to provide PNC with lucrative reinsurance arrangements and to include unwarranted charges. The mortgage agreements do not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance.

33.     Force-placed insurance policies are almost always more expensive than standard insurance coverage, often by as much as ten times. While the force-placed insurance policy primarily benefits the lender, servicer and insurer, the excessive cost is passed on to the borrower. *See Jeff Horowitz, Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker, Nov. 10, 2010, 12:00 pm, available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1.

**B.     Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

34.     Force-placed insurance programs have become a lucrative business for loan servicers and/or lenders such as PNC. Commonly, the servicer and/or lender selects the provider through a pre-arranged agreement and force-places the policy in such a way as to receive improper financial benefits. The servicer and/or lender benefits by placing the policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct commission payment, subsidized portfolio monitoring and/or through "reinsurance" premiums that are ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

35.     Under the direct payment arrangement, the provider of the force-placed

insurance policy pays a portion of the premium collected either directly to the servicer or to a subsidiary posing as an insurance "agent" in the form of commissions or as a "reimbursement" of the servicer's "incurred expenses" related to force-placing the insurance.

36.     PNC had such an arrangement with ASIC.

37.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary's agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy. –

38.     Illustrative of the typical kickback arrangements is the following graphic from American Banker:

## Sharing in the Profits

How servicers make money arranging force-placed coverage

### Commissions

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

### Reinsurance

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale





39.     J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYSDFS:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost services from affiliated service providers.

40.     Another experienced and noted expert in the area of force-placed insurance, Birny Birnbaum of the Center for Economic Justice, testified before the NYSDFS and

stated that:

> Servicers have financial incentive to force-place the insurance
> because the premium includes commission and other
> consideration for the servicer. With some servicers, the
> insurance is reinsured through a captive reinsurer of the
> servicer, resulting in additional revenue to the servicer from the
> force-placement coverage.

41.     Borrowers have no say or input into the carrier or terms of the force-placed
insurance policies. The terms and conditions of the insurance policy, as well as the cost of
the policy, are determined by the servicer and the insurer, rather than negotiated between
the borrower and the insurer.

42.     For their part, servicers have no incentive to comparison shop for the best
rate. Rather, servicers are financially motivated to refer borrowers to the provider that will
give the best financial benefit to the servicer in terms of commission and/or ceded
reinsurance premiums. As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance
premium is usually related to the size of the policy, the servicer actually has an incentive to
purchase the highest priced insurance, an interest diametrically opposed to that of the
borrower.

43.     Commonly, a mortgage loan servicer enters into an agreement with an
insurance provider pursuant to which it refers borrowers exclusively to the provider for
force-placed insurance.

44.     Force-placed insurance policies are not underwritten on an individual policy
basis. Rather, servicers' contracts with force-placed insurance providers such as ASIC

require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

45.    As J. Robert Hunter testified recently before the NYSDFS, "[the] lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."

46.    Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.

47.    While mortgage servicers and lenders like PNC profit greatly from force-placing insurance, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance. However, according to an article published by American Banker, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year." *See* Jeff Horowitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25PM), available at http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-

1.html (noting that servicers demand generous commissions and other payments in return for their referrals).

48.     "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases; the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the servicer from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial    Services    ("Birnbaum    House    Testimony"),    available    at http://financialservices.house.gov/uploadedfiles/072811birnbaum.pdf.

49.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission – totaling hundreds of millions of dollars – out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance – so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance." *Id.*

50.     Servicers commonly attempt to justify the high price of FPI policies by

pointing to the higher risk associated with the lack of individual policy underwriting. However, this premise belies the fact that the profit margins generated by force-placed policies are unheard of elsewhere in the insurance industry.

51.     Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.

52.     As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are unsupported by any evidence. Loss ratios have been historically low.

**C.     ASIC Has Operated A Similar Scheme With Lenders and Services Throughout The County**

53.     ASIC is one of the few insurers throughout the country that wrote force placed insurance policies for lenders such as PNC. It tracks loans in the lender's or servicer's mortgage portfolio, notifies customers about insurance requirements, initiates the cycle of letters and notices to customers about force-placed insurance and it places coverage on those borrowers when a borrower's insurance has lapsed.

54.     For below-market cost, ASIC monitored PNC's entire mortgage portfolio and performed PNC's insurance related services including: (i) claims-handling; (ii) record-keeping; (iii) monitoring the status of voluntary insurance to determine if sufficient coverage is in place; and (iv) corresponding with borrowers, masquerading as PNC and/or PNC Mortgage, to notify borrowers when voluntary coverage was insufficient and when

force-placed insurance had been issued on their properties.

55.     ASIC possessed liberal access to PNC's electronic data to perform insurance related services and was responsible for regularly updating such electronic data for PNC.

56.     At all times relevant to this lawsuit, ASIC's conduct was approved, authorized, ratified, and/or directly controlled by PNC.

57.     Each month ASIC compiled a report of the net premiums collected from PNC borrowers and then calculated the predetermined bogus "commission" on those net premiums, and kicked-back those commissions to PNC or its affiliates, even though those affiliates rendered no actual services in relation to the procurement of insurance or the payment of insurance premiums.

58.     In essence, ASIC relieved PNC Bank of its responsibility to monitor and perform insurance related functions on its sizeable mortgage portfolio. In exchange for assuming those extensive responsibilities, ASIC acquired the exclusive right to force insurance on thousands or millions of PNC customers at significantly inflated premiums without the risk of competition from other insurers.

59.     ASIC and its parent, Assurant, have engaged in the same force-placed insurance scheme with other lenders and servicers throughout the country, generating enormous profits for ASIC and the lenders and servicers.

60.     For example, in 2013 ASIC, Assurant and JP Morgan Chase agreed to pay $300 million to resolve class action allegations concerning similar force placed insurance practices at Chase. *Saccoccio v. JP Morgan Chase Bank, N.A.*, Case No. 13-cv-21107-

FAM (S.D. Fla.). In *Saccoccio*, the plaintiffs alleged that ASIC, Assurant and Chase were unjustly enriched "by more than $1 billion over the past five years" through a force placed insurance scheme. *Id.*, Doc. 59 at 1.

61.     ASIC's force-placed insurance scheme at issue in Saccoccio worked in much the same way that the scheme worked with PNC.

62.     In 2013 ASIC and its parent, Assurant, paid $14 million to end a probe by the New York Department of Financial Services about the "improper and unfair" force-placed insurance practices by ASIC and Assurant. *See* www.dfs.ny.gov/about/press2013/assur-order-130321.pdf (*In the Matter of American Security Insurance Company, American Bankers Insurance Company of Florida, and Assurant, Inc.*, Consent Order).

63.     The Department of Financial Services found that Assurant and ASIC had used a tactic known as "reverse competition" in order to increase profits form force-placed insurance. As part of the scheme, Assurant/ASIC offered lenders and servicers a share of profits from force-placed insurance rather than competing by offering lower premiums. The higher the premiums charged to borrowers, the more profits went to the lenders and servicers. In some cases, Assurant/ASIC paid lenders large, lump-sum amounts to switch their force-placed products. Assurant/ASIC also allowed reinsurance companies owned by the lender to enter into reinsurance agreements on force-placed insurance policies issued by Assurant/ASIC, spreading the risks associated with the policies and putting the lenders on both sides of the policies. The lender would pay an inflated premium on a force-placed policy and its reinsurance arm would collect as much as 75 per cent of the premium from

the lender, meaning it would collect 75 per cent of the profit. As described by the New York Superintendent of Financial Services, "Those improper practices created significant conflicts of interest and saddled homeowners, taxpayers and investors with millions of dollars in unfair and unnecessary costs." *Id.*

64.     As part of the Consent Order, Assurant and ASIC agreed to change their force placed insurance practices in New York, including limiting the payments that they could make to lenders, servicers and their affiliates and limiting the amount of insurance that they could demand from borrowers. Among other things, Assurant and ASIC agreed that "the amount of coverage that they force place on a borrower could not exceed the last known amount of coverage, provided that if the last known amount of coverage did not comply with the mortgage, then the amount of coverage shall not exceed the replacement cost of improvements on the property." *Id.* at ¶ 16.

65.     In 2015 ASIC and Assurant agreed to pay $1.8 million to end a class action brought by homeowners who had loans with HSBC and were force placed with insurance by ASIC.

66.     ASIC's force-placed insurance scheme at issue in the HSBC case worked in much the same way that the scheme worked with PNC.

67.     In April 2015, Assurant and ASIC reported that they and Ocwen Financial Corp. agreed to pay $140 million to settle a class action brought by homeowners who sued ASIC and Ocwen for their force-placed insurance practices.

68.     ASIC's force-placed insurance scheme at issue in the Ocwen case worked in

much the same way that the scheme worked with PNC.

69.   In February 2014, ASIC announced a $110 million settlement to resolve a class action claiming that ASIC engaged in a force-placed insurance scheme with Citibank. *Coonan v Citibank, et al*, Case No. 13-cv-353 (DNH/DEP) (N.D.N.Y.). In settling that case, the defendants represented that Citibank had charged borrowers almost $1 billion in force-placed premiums during the relevant time period, including more than $129,000,000 in force placed flood insurance premiums.

70.   ASIC's scheme in the Citibank case worked in a similar way to its force-placed scheme that is the subject of this Complaint.

71.   In 2014, ASIC announced a proposed settlement of a class action claiming that it and Assurant engaged in a force-placed insurance scheme with *Wells Fargo. Fladell v Wells Fargo*, et al, Case No. 13-cv-60721 (S.D. Fla.). The settlement purportedly was valued at $515,000,000 and included more than one million class members.

72.   ASIC's scheme in the Wells Fargo case worked in a similar way to its force-placed scheme that is the subject of this Complaint.

73.   In 2014, ASIC announced a proposed settlement of a class action claiming that it and Assurant engaged in a force-placed insurance scheme with Nationstar Mortgage, LLC. *Braynen v Nationstar Mortgage, LLC, et al*, Case No. 14-CV-20726-JAL.

74.   ASIC's scheme in the Nationstar case worked in a similar way to its force-placed insurance scheme that is the subject of this Complaint.

75.   ASIC and its parent, Assurant, have been named as defendants in other class

actions alleging claims based upon ASIC's participation in similar force placed insurance schemes.

**D.     Defendants' Force-Placed Insurance Operations**

76.     PNC was a party to an agreement with ASIC, whereby PNC received "commissions" from ASIC funneled through affiliates despite the fact that those affiliates performed no insurance related services for ASIC or PNC.

77.     In return, PNC provided ASIC and its affiliates with the unfettered right to collect noncompetitive, inflated premiums from insurance policies force-placed throughout the United States.

78.     The excessively inflated price of force-placed insurance provided to PNC borrowers did not represent the actual cost of providing the insurance, but instead represented the encompassed fees, commissions, "rebates" (or kickbacks) and other consideration for "faux" services purportedly provided by ASIC. The inflated price also consisted of a significant mark-up by ASIC, which took full advantage of distressed borrowers and the exclusive nature of its agreement with PNC.

79.     Plaintiff's force-placed insurance cost more than equivalent, market-priced insurance. The inflated, non-competitive portion of Plaintiff's force-placed insurance cost, therefore, was split between PNC and ASIC and damaged Plaintiff and the Class.

**E.     The Origination of Plaintiff's Mortgage**

80.     In 1993, Plaintiff purchased a home located at 5291 Elliott Road, Butler, Pennsylvania ("Property") and obtained a mortgage through Integra Bank to finance the

purchase.

81.    The terms of the Mortgage Agreement required the payment of certain insurance charges, as detailed in paragraphs  5 and 7:

**5.**      **Hazard or Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss of fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

\* \* \*

7. **Protection of Lender's Rights in the Property**.    If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums accrued by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amount disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms

> of payment, these amounts shall bear interest from the date of
> disbursement at the Note rate and shall be payable, with
> interest, upon notice form Lender to Borrower requesting
> payment.

*See* Mortgage, attached hereto as Exhibit B at ¶¶ 5,7.

82.     After Plaintiff closed on the loan, PNC became the lender and servicer on
Plaintiff's loan, subject to the terms in the Mortgage that Plaintiff had with Integra Bank.

**F.      PNC Charged Plaintiff for Force-Placed Insurance Pursuant to Lucrative Pre-
Arranged Agreements After Issuing Materially False and Misleading Notices**

83.     After Plaintiff bought his house, he maintained insurance as the Mortgage
required, including flood insurance.

84.     Originally Plaintiff maintained the flood insurance through policies issued by
State Farm.

85.     That flood insurance protected against damage to the improvements (the
structure) on the property as required by the Mortgage and by law, and each year Plaintiff
paid the premium for the flood insurance or the premiums were deducted from Plaintiff's
escrow account at PNC.

86.     In 2010 Plaintiff paid (from his escrow account) an annual premium of
approximately $422 for flood insurance through State Farm.

87.     In October 2010 State Farm stopped selling and renewing flood insurance
through the National Flood Insurance Program ("NFIP"). As a result, Plaintiff's flood
coverage through State Farm would stop on April 21, 2011 and would be transferred to
coverage through the federal government's program called "NFIP Direct".

88.     Around this time, ASIC was engaged in a secret force-placed insurance scheme with other lenders and services (such as Chase, Wells Fargo, Nationstar, Ocwen and HSBC) that was incredibly lucrative for ASIC and the lenders and servicers.

89.     PNC and ASIC entered a similar secret agreement to force place insurance on PNC's borrowers.

90.     Shortly after entering that agreement, PNC began force placing insurance on its borrowers thorough ASIC.

91.     PNC began to force place additional flood insurance on Plaintiff and charge him additional premiums for force placed flood policies that PNC obtained from ASIC pursuant to lucrative premium-splitting agreements.

92.     PNC and ASIC force-placed the flood policies on Plaintiff in a way that was consistent with the scheme used by ASIC with other lenders and servicers, including in the agreements that ASIC had with Chase, HSBC, Ocwen, Citibank, Wells Fargo and Nationstar, among others.

93.     PNC and ASIC force placed the flood insurance using false and misleading notices, letters and escrow statements that they disseminated to Plaintiff and the Class through the United States mail.

## G.     PNC's and ASIC's Misleading Notices

94.     On March 28, 2011 PNC (though ASIC) issued a "Notice of Insufficient Flood Coverage" stating that Plaintiff's flood insurance was inadequate and that if he did not provide proof of adequate insurance PNC would "purchase a lender placed flood policy

on your property." *See* March 28, 2011 PNC Notice, attached hereto as Exhibit C at 1.

95.    The notice also stated that "Our coverage may be substantially more expensive than the coverage you can purchase through your agent" and "As a result of this placement, affiliates of PNC Mortgage may earn commission or income." *Id.* (emphasis supplied).

96.    The Notice did not disclose that PNC would receive financial benefits and consideration as a result of the force-placement without earning any commission or income. Nor did the Notice disclose that PNC would violate the Mortgage's restriction on doing and paying only what was "necessary to protect the value of the Property and the Lender's rights in the Property."  Mortgage ¶7.

97.    At the time, Plaintiff already had the flood coverage required by the Mortgage and by law.

98.    Nevertheless, PNC and ASIC force placed an additional flood policy on Plaintiff's policy and charged his escrow account $410 for that coverage. At the time, Plaintiff already had his own flood coverage for which he was paying $453 per year and which provided the full flood coverage required by the Mortgage and by law but as a result of Defendants force placing an additional flood policy on him, his flood insurance premiums totaled $863 per year.

99.    PNC and ASIC continued this practice in 2012 by force placing another flood policy on Plaintiff when he already had the coverage required by the Mortgage and by law.

100.    On April 26, 2012 PNC (though ASIC) issued a "Notice of Flood Insurance

Coverage Change" stating that Plaintiff's flood insurance was insufficient. *See* April 26, 2012 PNC Notice, attached hereto as Exhibit D at 1. The notice also stated that "This coverage may be substantially more expensive than the coverage you can [purchase] through your agent". *Id.* (emphasis supplied).

101.   The Notice did not disclose that PNC would receive financial benefits and consideration as a result of the force-placement without earning any commission or income. Nor did the Notice disclose that PNC would violate the Mortgage's restriction on doing and paying only what was "necessary to protect the value of the Property and the Lender's rights in the Property."  Mortgage ¶7.

102.   In 2012 PNC and ASIC charged Plaintiff $613 for a premium on a force-placed flood policy when Plaintiff already had a flood policy that provided the coverage required by the Mortgage and by law. At the time, Plaintiff was paying a premium of $467 for his own flood coverage.

103.   As a result of the additional charges by Defendants for the force flood coverage, Defendants charged Plaintiff's escrow account approximately $1,100 for flood insurance in 2012.

104.   On May 9, 2013, PNC (though ASIC) issued a "Notice of Flood Insurance Renewed By Lender Due To Insufficient Coverage" stating that Plaintiff's flood insurance was insufficient. *See* May 9, 2013 PNC Notice, attached hereto as Exhibit E at 1.

105.   The notice stated that "Previously, PNC Mortgage, a division of PNC Bank, National Association (PNC Mortgage) sent you notification that the amount of coverage

provided by your current insurance is less than the amount of flood insurance coverage required by PNC Mortgage. You are required to insure your structure/improvements for the minimum coverage amount: 100% of replacement cost of the dwelling, as determined by your homeowners' insurance provider; or the maximum insurance available from the National Flood Insurance Program, which is currently $250,000. Our records indicate that we have not received adequate flood insurance coverage for your property. In the mortgage documents you signed, you agreed to maintain insurance on your property in the amount and for the period required by your mortgage company. Failure to provide adequate insurance coverage is a breach of this requirement."

106.   The Notice did not disclose that by force placing an additional flood policy, PNC would violate the Mortgage's restriction on doing and paying only what was "necessary to protect the value of the Property and the Lender's rights in the Property." Mortgage ¶7.

107.   In 2013 Defendants again force placed a flood policy on Plaintiff and charged Plaintiff's escrow account $613 for that insurance when Plaintiff already had the required flood insurance and was paying an annual premium of $526.

108.   On April 28, 2014, Defendants mailed to Plaintiff a "Notice of Lender Placed Flood Insurance Due To Insufficient Coverage" informing Plaintiff that PNC had force placed a flood insurance policy on Plaintiff's property. A copy is annexed as Exhibit F.

109.   At the time, Plaintiff already had his own flood coverage that met the requirements of the Mortgage and the law.

110.    On March 9, 2015 PNC (through ASIC) issued a letter to Plaintiff stating that "because we did not have evidence that you had flood insurance coverage to meet the minimum requirements on the property listed above, we bought an additional flood insurance policy on your property and added the cost to your mortgage loan account. . . . Because sufficient flood insurance is required on your property, we intend to maintain flood insurance on your property by renewing or replacing the insurance we bought. . . . The insurance we buy will cost an estimated $580 annually, which may be more expensive that the insurance you can buy yourself." " (emphasis in original). *See* March 9, 2015 PNC letter, attached hereto as Exhibit G at 1. The letter did not disclose that PNC or its affiliates would receive any kind of financial benefits or consideration as a result of the force-placement.

111.    PNC's (and ASIC's) notices and letters were materially misleading because the amounts charged to Plaintiff for the force-placed insurance were greater than the actual cost to insure the property (because it included amounts attributable to kickbacks in the form of commissions, illusory reinsurance, and/or below-cost outsourcing) and greater than the costs of insurance PNC could have obtained elsewhere. The amounts charged were above the then-existing market rate.

112.    At no time did Defendants disclose to Plaintiff that the amounts they charged him covered kickbacks to PNC, splitting of premiums by PNC and ASIC, reinsurance profits, bundled administrative costs, below-cost services, or any of the other impermissible charges described in this Complaint.

113.    Further, PNC did not charge Plaintiff the "necessary" or actual "cost" of the policy as required by the Mortgage and the representations of PNC; rather the charges include illegal commissions, kickbacks, reinsurance profits, and profits from below cost services as described further in this Complaint. Additionally, the policy placed by PNC on Plaintiff's property was substandard compared to those which PNC could have obtained in the open market.

114.    Borrowers were also charged for the undisclosed "commission" received by PNC and the notices made no reference to the arrangement between PNC and ASIC for kickbacks, commissions and other benefits.

115.    Moreover, the notices were objectively false and misleading because they failed to disclose, inter alia: (1) PNC and its affiliates had preexisting agreements with ASIC that guaranteed PNC would receive unearned, substantial kickbacks and below market-cost portfolio monitoring and other benefits from ASIC; and (2) that the cost of force-placed insurance was "substantially more expensive" because of an illicit quid pro quo arrangement between PNC and ASIC whereby PNC received substantial kickbacks and other unearned consideration in return for giving ASIC the exclusive right to receive inflated, noncompetitive force-placed premiums on PNC's entire loan portfolio.

116.    The amount listed as a premium in the escrow statements were materially false and misleading for the same reasons that the notices and letters were misleading and because the "annual premium amount" really was for more than just the premium and because:

(a)     The notices and statements represent that borrowers were responsible for the "the cost of the coverage PNC Mortgage has purchased" when, in actuality, borrowers were also charged for the undisclosed "commission" and benefits received by PNC;

(b)     The notices and statements failed to disclose that PNC and its affiliates had preexisting agreements with ASIC that guaranteed PNC Bank would receive unearned kickbacks and below market-cost portfolio monitoring;

(c)     The notices and statements failed to disclose that the cost of force-placed insurance was "substantially more expensive" because of an illicit quid pro quo arrangement between PNC and ASIC whereby PNC received kickbacks and other unearned consideration in return for giving ASIC the exclusive right to receive inflated, noncompetitive force-placed premiums on PNC's entire loan portfolio;

(d)     The notices and statements misrepresented that "PNC Mortgage may earn commissions or income" and failed to disclose that the "commissions or income" paid to PNC including portfolio-monitoring below-market cost and rebates or kickbacks that were not in connection with any actual services rendered (and, thus, were not "earned" "commission" but instead were a kickback);

117.    If the foregoing notices, letters and escrow account statements sent by PNC contained this material information, a reasonable borrower would not have paid for or agreed to the force-placed insurance without protest.

**H.     Government Response to Mortgage Lender and Servicer Force-Placed Insurance Practices**

118.    Force-placed insurance practices of mortgage lenders and servicers,

insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed insurance following a lapse in their policies.

119.    State attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine (49) state attorneys general entered into a historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement); see also Jeff Horowitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25 PM) (http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html).

120.    Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance. Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed

insurance for a commercially reasonable price. *Id.; see also Consent Judgment, United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

121.  Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry – which also had a relatively low level of losses – as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. See, e.g., Broderick Perkins, Title Insurance Industry in Hot Water with Regulators Again, SAN JOSE BUSINESS JOURNAL (May 22, 2005), available at http://www.bizjournals.com/sanjose/stores/2005/05/23/story4.html.

122.  Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery." As a result, a number of providers have abandoned such arrangements altogether. *See* Press Release, Florida Department of Insurance (July 20, 2005), available at http://www.departmentofinsurance.ca.gov/0400-news/0100-press-releases/0080-2005/release069-05.cfm.

123.  Fannie Mae has changed its policies so as to curb bank and servicers' improper practices. Fannie Mae issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements, and allowable reimbursable expenses for

lender-placed insurance" for servicers of the loans it holds. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude: (1) any lender-placed insurance commission earned on that policy by the servicer or any related entity; (2) costs associated with insurance tracking or administration; (3) or any other costs beyond the actual cost of the lender-placed insurance policy premium. See Fannie Mae Servicing Guide Announcement SVC-2012-04, available at https://www.fanniemae.com/content/announcement/svc1204.pdf.

124.    The New York State Department of Financial Services' hearings on force-placed insurance resulted in government action and findings that borrowers were over-charged for force-placed insurance. On June 12, 2012, Governor Cuomo's website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance." It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing. Also, DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down. In New York, two companies have 90 percent of the market. In addition, the hearings made clear that high force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

See Governor Cuomo Announces DFS Action Could Save Some New York Homeowners Millions in Overcharges to Home Insurance, available at http://www.governor.ny.gov/press/06122012DFS.

125.    The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is also unnecessary. For example, during 2009, one insurer collected approximately $2.7 billion of premiums through its specialty insurance division, which is overwhelmingly devoted to force-placed insurance. Notably, this insurer paid out only 36% of this amount in claims, though in the company's other lines of business a 70% claims-to-premiums ratio is the norm. Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product.

126.    Birny Birnbaum, in his testimony before the New York Attorney General, presented statistics collected by the NAIC reflecting nationwide loss ratios for lender-placed insurance during the 2004-2011 period as being, on average, more than thirty-five points lower than the ratios for commercially available homeowners policies. See Birnbaum NYSDFS Testimony at 9, available at http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_ Justice_testimony.pdf. When confined to the period from 2007-2011, the disparity between lender-placed insurance loss ratios and those of commercially available homeowners policies was nearly 42 points. *Id.*

127.    On or about April 18, 2013, Governor Cuomo announced that a NYSDFS investigation produced a New York settlement with Defendant ASIC Insurance Corporation. *See* April 18, 2013. The NYSDFS' investigation revealed that:

> ASIC competed for business from the banks and mortgage servicers through what is known as "reverse competition." That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits.

> This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums. That's because the higher the premiums, the more that the insurers paid to the banks.
>
> In some cases, ASIC paid commissions to insurance agencies and brokers that are affiliates of mortgage servicers. Typically the commissions are ten to twenty percent of the premium written on the servicer's mortgage loan portfolio. The evidence from the investigation indicates that the affiliated agencies and brokers do little to no work for the commissions ASIC had paid them.

*See* NDYSDFS Press Release, April 18, 2013, available at http://www.dfs.ny.gov/about/press2013/pr1304181.htm.

128.    Three other governmental investigations were brought against ASIC related entities. One was noticed by the Minnesota Department of Commerce on March 22, 2013, one by the Office of the Massachusetts Attorney General on April 30, 2013, and one by the Missouri Department of Insurance, Financial Institutions and Professional Registration on July 11, 2013.

**I.    PNC's Force Placed Insurance Policies and Practices Provide Unearned and Unjustified Profits and Kickbacks to Defendants**

129.    As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers, available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-

1028474-1.html?zkPrintable=1&nopagination=1. These costs are ultimately paid by the borrowers.

130.    Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year.

131.    Moreover, the charges that PNC chose to impose upon borrowers for force-placed insurance also unlawfully included the cost of portfolio monitoring and tracking services for PNC's entire loan portfolio, the cost of which was then passed on to the small percentage of borrowers whose properties were force placed.

132.    Unjustified fees which amount to kickbacks also inflate the premiums of force placed insurance:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in [FPI] because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals – and such activity is a rare event for most servicers.

Birnbaum       NYSDFS       Testimony       at       18,       available       at
http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_
Justice_testimony.pdf.

133.    PNC's practices of unlawfully profiting from force-placing insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of these kickbacks – to the detriment of consumers.

134.    PNC (through ASIC) has threatened and, indeed, stifled competition through this scheme. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers, available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1.

## CLASS ACTION ALLEGATIONS

135.    Plaintiff asserts his RICO claims on behalf of the following proposed nationwide Class:

> All persons who have or had a mortgage loan or line of credit owned, originated or serviced by PNC and/or its affiliates secured by property located in United States and, in connection therewith, were charged for "force-placed" flood insurance on the secured property within the applicable statute of

limitations.

136.   Plaintiff asserts his state law claims on behalf of the following proposed Pennsylvania sub-Class:

> All persons who have or had a mortgage loan or line of credit owned, originated or serviced by PNC and/or its affiliates secured by property located in Pennsylvania and, in connection therewith, were charged for "force-placed" insurance on the secured property within the applicable statute of limitations.

137.   These Classes exclude any judge or magistrate assigned to this case, Defendants and any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, and assigns.

138.   <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Class includes likely thousands of PNC's customers.

139.   <u>Typicality</u>: Plaintiff's claims are typical of the members of the proposed Class.

140.   <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class, and has retained counsel experienced in complex class action litigation. Plaintiff has no interests which are adverse to those of the Class that they seek to represent.

141.   <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

A.   Whether Defendants' form letters to borrowers materially misrepresent the nature of force-placed insurance;

B.    Whether PNC maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

C.    Whether PNC received commissions or any other payments or things of value from force-placed insurance providers;

D.    Whether PNC participated in arrangements that involved kickbacks;

E.    Whether Defendants received financial benefits from the force-placed insurance providers in the form of insurance monitoring, tracking and processing services;

F.    Whether Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a bona fide service in connection with the force-placed insurance and its purpose;

G.    Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

H.    Whether PNC and ASIC devised a scheme to defraud borrowers and loan owners by charging them for force-placed insurance;

I.    Whether the scheme alleged herein constitutes mail or wire fraud;

J.    Whether Defendants have been unjustly enriched;

K.    Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages; and

L.    Whether Plaintiff and the Class are entitled to declaratory, injunctive, and other equitable relief.

142.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

143.    Plaintiff is a member of the Class and will fairly and adequately represent

and protect the interests of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

144.   Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

145.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

146.   Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

147.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

148.   Plaintiff reserves his right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## COUNT I

**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968**
**(Against all Defendants)**

149.   Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

150.   Plaintiff, each Class member, and each Defendant, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c)

### The Enterprise

151.   For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants, including their respective officers, directors, employees, agents and direct and indirect subsidiaries ( "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

152.   The Enterprise was primarily managed by PNC, which organized the fraudulent scheme and procured the involvement of the Defendants.

153.   Alternatively, the Enterprise was managed by ASIC, which organized the fraudulent scheme and procured the involvement of PNC, just as ASIC procured the involvement of other lenders and servicers in similar schemes such as the force-placed insurance schemes involving Wells Fargo, Ocwen, HSBC, Nationstar and Chase.

154.    Each of the Defendants, however, agreed to, and did, participate in the conduct of the Enterprise, and carried out their roles using broad and independent discretion.

155.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for force-placed insurance with respect to PNC-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, PNC and ASIC, and their affiliates.

156.    The Enterprise operated from at least 2009 and its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

157.    Since at least 2009 PNC has obtained force-placed insurance policies from ASIC for the loans PNC services.

158.    PNC hires ASIC as a subcontractor to perform PNC's "insurance tracking" duties under PNC's servicing agreements. Insurance tracking is a labor-intensive servicing responsibility related to force-placed insurance. It consists of monitoring the status of homeowners' voluntary insurance to confirm that it is in force, notifying homeowners of any insurance deficiencies, and securing force-placed insurance when appropriate.

159.    This action is brought because PNC, together with ASIC and its affiliates,

devised and carried out a scheme to defraud borrowers and loan owners by overcharging them for force-placed insurance. Pursuant to the scheme, ASIC and its affiliates pay PNC secret rebates, *i.e.*, kickbacks, camouflaged through complex transactions using affiliates and related parties. PNC pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the force-placed insurance. In other words, the rebates reduce PNC's force-placed insurance costs, but those savings are not passed through to borrowers. Because the amounts supposedly paid by PNC for force-placed insurance constitute "servicing advances," loan owners bear the inflated charges through reduced loan proceeds and higher loss severities to the extent borrowers fail to pay.

160.   Any amounts paid by the servicer to buy force-placed insurance count as "servicing advances" under pooling and services agreement and other agreements between the servicer and the loan owner. The servicer is entitled to recoup such advances from the proceeds of the loan, whether through payments made by the borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has the right to be reimbursed before any money is passed through to the securitization trust or other loan owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

161.   As devised by PNC and/or ASIC, the scheme involves the payment of rebates/kickbacks in at least two forms: (i) below-market tracking services and (ii) bogus "commissions."

162.     The below-market cost portfolio monitoring and tracking services are provided by ASIC. More specifically, the insurers and underwriters compensate ASIC for force-placing insurance, which includes compensation for their tracking services. PNC pays only nominal consideration. The below market cost tracking services constitute rebates/kickbacks in kind.

163.     The bogus "commissions" paid by ASIC to PNC or to PNC's affiliates is also a kickback. As with the tracking services, the money for the "commissions" is derived from the force-placed insurance premiums paid by PNC. The "commission" payments are made on the pretense that a third-party insurance agent that introduced the insurance customer, i.e., PNC, to ASIC and its affiliates. At all relevant times, however, this pretense has been false.

164.     The kickbacks from ASIC were received by PNC.

165.     Taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by PNC, have also been grossly overcharged for force-placed insurance as a result of the scheme.

**The Pattern of Racketeering Activity**

166.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this Complaint. The Defendants have conducted the affairs of the Enterprise and participated in the operation

and management thereof at least through the following conduct:

167.    PNC enters into servicing agreements with owners and/or holders of whole loans. The servicing agreements provide, inter alia, that PNC is obligated to maintain continuous insurance on the secured properties.

168.    PNC buys force-placed insurance with respect to the loans it services from ASIC or its affiliates. PNC pays insurance premiums to ASIC for the force-placed insurance.

169.    PNC hires ASIC as a subcontractor to perform PNC's "insurance tracking" responsibilities.

170.    PNC and ASIC, and their affiliates conceal from the public, borrowers, and loan owners, that PNC pays ASIC below market price for its insurance tracking services and that ASIC is also compensated by the insurance company and underwriters for these services.

171.    ASIC or its affiliates pay rebates or kickbacks to PNC.

172.    The money to pay the rebates or kickbacks is derived from PNC's force-placed insurance premiums. The amount of the rebates or kickbacks is computed as a percentage of PNC's force-placed insurance premiums.

173.    The rebates and kickbacks are paid in the form of below-market cost tracking services and bogus "commissions."

174.    The bogus "commissions" are paid by ASIC to PNC or an affiliate of PNC on the false pretense that the affiliate is a third-party insurance agent. ASIC falsely labels

these payments as "commissions."

175. As a *quid pro quo* for the rebates and kickbacks, PNC continues to procure force-placed insurance from ASIC or its affiliates for inflated, noncompetitive prices and continues to outsource insurance tracking to ASIC.

176. PNC retains the rebates/kickbacks for itself, while billing and charging borrowers based on the full purported price of the force-placed insurance. The rebates/kickbacks reduce PNC's force-placed insurance costs, but those savings are not passed through to borrowers. Instead, borrowers are billed and charged the full purported price of the force-placed insurance even though that does not reflect the actual cost of the insurance policy.

177. Additionally, when borrowers make their mortgage payments, PNC subtracts the inflated amounts billed with respect to force-placed insurance off the top before applying any balance to principal, interest, or other charges.

178. Because amounts paid for force-placed insurance are servicing advances, PNC has inflated charges to borrowers by failing to pass through the rebates and kickbacks to borrowers. PNC reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

179. ASIC computes the amounts purportedly due and issues notices to borrowers fraudulently setting forth the balances owed for force-placed insurance based on the full prices of the force-placed insurance premiums without subtracting the rebates and

kickbacks.

180.   ASIC represents to consumers that notices are issued by PNC.

181.   The notices and letters are on PNC letterhead although ASIC sends those letters and notices.

182.   PNC approved and directed the issuance of the notices.

183.   The materially omit that PNC is already reimbursed for a portion of the inflated premium by ASIC. By requiring borrowers to pay the full price of the inflated premium, PNC gives itself a windfall.

184.   The notices are materially false by representing that borrowers are responsible for the cost of insurance when they actually are responsible for more than just the cost of the insurance. They are charged for the undisclosed "commission" that PNC receives.

185.   To the extent that any notices that Defendants issue reveal that either Defendant will receive any kind of compensation in connection with the force-placed insurance, that statement was objectively false and misleading because it fails to disclose, inter alia: (1) PNC "always" will receive compensation (instead of "may" receive compensation); (2) PNC and its affiliates had preexisting agreements with ASIC that guaranteed that PNC would receive a substantial rebate or kickback; (3) the compensation paid to PNC, including below-market cost portfolio-monitoring and rebate/kickbacks, is not in connection any actual services rendered, and thus is not earned compensation but instead is a kickback; (4) under the agreements, PNC was not compensated for the placement of the

individual policies or certificates, as the notice suggests, but rather was rebated or kicked-back money for agreeing to enter into exclusive force-placed insurance and outsourcing agreements with ASIC.

186.   The notices and statements lull borrowers into believing that no fraudulent scheme is occurring and that PNC and ASIC and/or their affiliates are simply exercising PNC's rights under borrowers' mortgage loan agreements. By lulling Plaintiff and the Class into a false sense of security, the notices and statements make it less likely that borrowers will object to the improper charges, complain to the authorities, or bring lawsuits.

187.   PNC issues remittance reports, monthly servicing reports, and annual certifications of compliance to loan owners that include information about PNC's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for PNC's advances and reimbursements based on the full prices of the force-placed insurance without subtracting the rebates and kickbacks. The reports and certifications also fraudulently exclude the compensation that PNC derives from the kickbacks and rebates, which are not disclosed in the reports and certifications. Moreover, the reports and certifications fraudulently conceal that ASIC is not meaningfully compensated by PNC from PNC's own funds but, instead, through the force-placed insurance premiums, despite the fact that PNC is thereby breaching its agreements with loan owners. The reports and certifications also omit that PNC unjustly enriched itself by acting outside of its contractual authority within the mortgage loan agreements by billing

borrowers for reimbursement of force-placed insurance costs in amounts in excess of PNC's actual costs.

188.   The remittance reports, monthly servicing reports, and annual certifications of compliance lull loan owners into believing that no fraudulent scheme is occurring and that Defendants are simply exercising PNC's rights under their servicing agreements. By lulling loan owners into a false sense of security, the remittance reports, monthly servicing reports, and annual certifications of compliance notices and statements make it less likely that loan owners will object to the improper charges, complain to the authorities, or bring lawsuits.

### The Predicate Acts of Mail and Wire Fraud

189.   The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Enterprise engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by PNC and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

190.   The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of PNC and ASIC and their affiliates in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

191.   It was reasonably foreseeable to PNC and ASIC and their affiliates that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

192.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants. Nevertheless, Plaintiff can allege such transmissions generally.

193.    For the purpose of furthering and executing the scheme, PNC and ASIC and their affiliates regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

(a)    ASIC issued materially false and misleading notices relating to force-placed insurance to borrowers via mail;

(b)    ASIC also communicated to borrowers with respect to force-placed insurance issues by telephone;

(c)    PNC issued monthly statements incorporating the falsely overstated force-placed insurance charges to borrowers via mail and/or wire;

(d)    PNC issued materially false and misleading remittance reports, monthly servicing reports and annual certifications of compliance to loan owners via the mail and/or electronically via wire;

(e)    ASIC and/or PNC received force-placed insurance payments from borrowers via mail and/or wire; and

(f)    ASIC transmitted funds to PNC's affiliates reflecting purported "commissions" via mail and/or wire.

194.    PNC and ASIC and their affiliates utilized the mails and/or wires for the purpose of furthering and executing the scheme. As PNC's insurance tracking subcontractor, ASIC drafts and issues standardized notices to borrowers.

195.    Prior to the placement of force-placed insurance, ASIC issues notices to borrowers (such as the "Notice of Insufficient Flood Insurance Coverage", the "Notice of Flood Insurance Coverage Change", and the "Notice of Flood Insurance Renewal") demanding evidence of insurance and warning that PNC will force place coverage if such evidence is not forthcoming. Once force-placed insurance is imposed, ASIC issues a letter (on PNC letterhead) to inform borrowers that it has obtained coverage.

196.    This is the same profitable force-placed insurance scheme in which ASIC engaged with other lenders and servicers, such as Chase, Ocwen, Wells Fargo, Nationstar and HSBC.

197.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by PNC, ASIC and their affiliates. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, PNC, ASIC and their affiliates engaged in similar activities with respect to each member of the Class and with respect to the owners of the loans of each member of the Class.

198.    Each such electronic and/or postal transmission constituted a predicate act of

wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

199.   PNC, ASIC and their affiliates each participated in the scheme to defraud knowingly, willfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with force-placed insurance.

200.   The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur the falsely inflated, unauthorized charges with respect to force-placed insurance and thereby enable PNC, ASIC and their affiliates to reap illicit profits.

201.   PNC, ASIC and their affiliates were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

**Honest Services Fraud**

202.   The scheme alleged herein also constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

203.   The wire fraud and mail fraud statutes make it a crime to, inter alia, devise a scheme to deprive another of "honest services."

204.   The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud,
> or for obtaining money or property by means of false or

> fraudulent pretenses, representation, or promises . . . [uses the
> mails in furtherance of the scheme shall be punished by
> imprisonment or fine or both].

18 U.S.C. § 1341.

205.   The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

206.   18 U.S.C. § 1346 provides:

> For the purposes of this chapter [including § 1341 and § 1343],
> the term "scheme or artifice to defraud" includes a scheme or
> artifice to deprive another of the intangible right to honest
> services.

18 U.S.C. § 1346.

207.   Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of

honest services within the scope of the mail and wire fraud statutes.

208.   In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court

addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute

criminalizes "fraudulent schemes to deprive another of honest services through bribes or

kickbacks." *Id.* at 404. In fact, the Court held that, for purposes of the mail and wire fraud

statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services"

provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that

Congress intended § 1346 to reach at least bribes and kickbacks" because the "vast

majority" or pre-McNally honest services cases involved bribery or kickback schemes. *Id.*

at 365.

209.   At all relevant times, PNC owed legal duties to render services to loan

owners and borrowers. In all cases, those duties included maintenance of continuous insurance coverage on the secured properties. The value of PNC's services depended on PNC rendering those services in an honest manner. Nevertheless, PNC misused its position as the servicer of the loans to extract bribes and kickbacks from ASIC. PNC thereby breached its obligation to render "honest services" to loan owners and borrowers. PNC and ASIC devised a scheme or artifice to defraud borrowers of their intangible right to PNC's honest services through kickbacks.

**The Predicate Acts of Extortion,
Attempted Extortion,
<u>And Conspiracy to Commit Extortion</u>**

210.   The pattern of racketeering activity also consisted of extortion, attempted extortion, and conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

211.   As alleged above, the mortgage loan agreements of Plaintiff and the Class authorize the lender to charge borrowers the costs of any insurance force-placed on their property. Nothing in the agreements authorizes the lender to charge any amount in excess of the lender's cost. Pursuant to the scheme alleged herein, however, Plaintiff and the Class were charged amounts in excess of PNC's force-placed costs with respect to the borrowers' property. The rebates/kickbacks that PNC received reduced such costs. Nevertheless, PNC charged borrowers based on the full purported price of the force-placed insurance.

212.   At all relevant times, by virtue of the conduct alleged above, PNC, ASIC and their affiliates induced, and attempted and conspired to induce, Plaintiff and the Class to

pay these extra-contractual amounts, which were in excess of PNC's force-placed insurance costs and not due under their respective mortgage loan agreements, through the wrongful use of actual or threatened fear of economic harm. Specifically, PNC, ASIC and their affiliates used, and attempted and conspired to use, the actual or threatened fear of default and foreclosure to induce Plaintiff and the Class to pay the improper charges imposed.

213. As alleged above, the mortgage loan agreements of Plaintiff and the Class entitled PNC to add any force-placed insurance charges to the balances of their loans and to foreclose in order to collect such charges if unpaid. The mortgage loan agreements provide, in words or substance, that any insurance charges "shall become additional debt of Borrower secured by this Security Instrument," Exhibit B (Mortgage at ¶ 7), and that the lender or its authorized servicer is entitled to foreclose to collect any unpaid amounts due.

214. Mortgage loan servicers routinely collect unpaid force-placed insurance charges through foreclosure. Superintendent Lawsky found that force-placed insurance charges frequently "push distressed homeowners over the foreclosure cliff."

215. By virtue of the facts alleged above, Plaintiff and the Class reasonably believed: (i) that PNC possessed the power to collect any unpaid force-placed insurance charges through foreclosure; and (ii) that PNC would exploit that power and foreclose if borrowers failed to pay the insurance charges that PNC and ASIC imposed.

216. Additionally, by virtue of the facts alleged above, PNC, ASIC and their affiliates agreed to engage in the acts alleged above, and intentionally performed acts, including, without limitation, the acts alleged above, and under the circumstances as PNC,

ASIC and their affiliates believed them to be, constituted violations of the Hobbs Act and/or substantial steps in the commission of a Hobbs Act violation. Moreover, PNC, ASIC and their affiliates thereby affected and intended to affect interstate commerce.

217.   Plaintiff and the Class received nothing of value in exchange for payment of the excess force-placed insurance charges.

## Injury to Plaintiff and the Class

218.   As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants and their affiliates, Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

219.   Plaintiff and the Class paid or were charged falsely inflated, unauthorized force-placed insurance premiums by reason, and as a direct, proximate and foreseeable result, of the scheme alleged. Moreover, the overcharging of Plaintiff and the Class for force-placed insurance was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that PNC was entitled to recoup "off the top" from the proceeds of the loans.

220.   Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

221.   ASIC is directly liable for its own violations of RICO, as alleged above.

222.   As alleged above, at all times relevant herein, when ASIC committed the RICO violations alleged herein, ASIC was acting within the course and scope of its

authority as an authorized agent of PNC and its affiliates.

## COUNT II

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C. § 1962(d)
### (Against All Defendants)

223.    Plaintiff repeats and realleges each and every paragraph above as if set forth herein.

224.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

225.    As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

226.    Defendants and their affiliates formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to force-placed insurance. The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to force-placed insurance.

227.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

228.    As set forth in Count I, above, Defendants and their affiliates conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

229.   Defendants and their affiliates were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

230.   Defendants and their affiliates committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

231.   As a direct and proximate result of the overt acts and predicate acts of Defendants in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property in an amount to be determined at trial. Such injuries include, but are not limited to, fraudulently inflated charges with respect to force-placed insurance, as a direct, proximate and foreseeable result of the scheme alleged herein.

232.   Under the provisions of 18 U. S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

233.   PNC and ASIC are directly liable for their own RICO conspiracy violations, as alleged above. PNC and ASIC are also liable for the RICO conspiracy violations of each other as well as for the RICO conspiracy violations of their agents. As alleged above, pursuant to the scheme, PNC engaged ASIC to provide PNC with tracking services. At all times relevant herein, when ASIC committed the RICO conspiracy violations alleged

herein, ASIC was acting within the course and scope of its authority as an authorized agent of PNC.

## COUNT III

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against PNC)

234.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

235.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

236.     Where an agreement affords one party the power to make discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

237.     Plaintiff and the Class members' mortgage contracts allow PNC to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

238.     PNC is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases force-placed insurance and negotiate any price for the coverage it procures. PNC has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith. Plaintiff does not seek to vary the express terms of the mortgage contract, but only to insure

that PNC exercise its discretion in good faith.

239.    PNC breached the implied covenant of good faith and fair dealing by, among

other things:

> (a) Manipulating the force-placed insurance market by selecting
> insurers (here, ASIC) with inflated premiums that include
> kickbacks to PNC and issuing excess insurance coverage not
> necessary to cover PNC's risk, and by failing to seek
> competitive bids on the open market and instead contracting to
> create "back room" deals whereby insurance coverage is
> routinely purchased from ASIC without seeking a competitive
> price;

> (b) Exercising its discretion to choose an insurance policy in
> bad faith and in contravention of the parties' reasonable
> expectations, by purposefully selecting high-priced force-placed
> insurance policies with artificially inflated premiums to
> maximize its own profits;

> (c) Assessing inflated, duplicative, and unnecessary amounts
> for force-placed insurance against Plaintiff and the Class and
> misrepresenting the reason for the cost of the policies;

> (d) Allowing PNC and its affiliates to collect a percentage of
> the amounts charged to Plaintiff and the Class as a kickback
> and passing that percentage on to the borrower, thereby
> creating the incentive to seek the highest-priced premiums
> possible;

> (e) Charging Plaintiff and the Class for commissions when the
> insurance is prearranged and no commission is due;

> (f) Charging Plaintiff and the Class the cost of having the
> vendor perform its obligation of administering its mortgage
> portfolio, which is not properly chargeable to Plaintiff or the
> Class;

(g) Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h) Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(i) Charging Plaintiff and the Class an inflated premium due to the captive reinsurance arrangement.

240.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

## COUNT IV
## UNJUST ENRICHMENT/DISGORGEMENT
## (AGAINST PNC)

241.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

242.    PNC has been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct. The kickbacks, commissions and other compensation that PNC received in connection with force-placed insurance were not legitimately earned, and came at the ultimate expense of its customers who had insurance force-placed on them.

243.    PNC accepted and retained these payments under such circumstances that it would be inequitable for PNC to retain the benefit without payment to Plaintiff and the other Class members.

244.    Plaintiff and the Class members have conferred a substantial benefit upon PNC from the force-placed insurance premiums paid by Plaintiff and the Class members.

245.    As a result of PNC's unjust enrichment, Plaintiff and the Class members have

sustained damages in an amount to be determined at trial and seek a full disgorgement and restitution of PNC's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above and throughout the Complaint.

## COUNT V

## UNJUST ENRICHMENT
## (AGAINST ASIC)

246.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

247.    ASIC has been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct.

248.    ASIC gave PNC, either directly or through an affiliate, a kickback disguised as a legitimate commission, but PNC did not provide any services that entitled it to a commission.

249.    ASIC came to an agreement with PNC and its affiliates to inflate premium prices charged to borrowers so that it could kick back to PNC a percentage of that money.

250.    As consideration for this agreement, ASIC became the exclusive insurer for PNC borrowers who were force-placed.

251.    In addition to the benefit of not competing in the insurance market for policies, ASIC was able to charge more than the market price for an insurance policy. While ASIC kicked back a portion of this amount to PNC and/or its affiliates, ASIC retained a substantial portion of these inflated premiums at the expense of Plaintiff and the Class.

252.    Plaintiff and the Class have thus conferred a substantial benefit upon ASIC.

253.   Under such circumstances, it would be inequitable for ASIC to retain these benefits without payment to Plaintiff and the other Class members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief as follows:

A.   Determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Designating Plaintiff as Class representative;

C.   Designating Plaintiff's counsel as counsel for the Class;

D.   Issuing proper notice to the Class at Defendants' expense;

E.   Declaring that Defendants' conduct violated RICO;

F.   Declaring that PNC's conduct as alleged herein violated PNC's duty of good faith and fair dealing;

G.   Declaring that Defendants' conduct as alleged herein was inequitable and that Defendants were unjustly enriched by their conduct;

H.   Declaring that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiff and the Class as alleged herein;

I.   Awarding appropriate equitable relief, including restitution and an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for insurance coverage, allowing customers to close loans without first paying premiums for insurance that were not necessary or required by law, prohibiting Defendants from imposing unfair and unlawful insurance requirements on borrowers, prohibiting Defendants from earning commissions or other compensation for themselves or affiliated entities on force-placed insurance policies, and requiring Defendants to cease and desist from engaging in further unlawful conduct in the future;

J.      Awarding actual damages, treble damages, punitive damages, and interest;

K.      Awarding reasonable attorneys' fees and costs to the full extent permitted by law; and

L.      Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

Dated: May 4, 2015                     Respectfully submitted,

By: /s/ Stanley M. Stein
Stanley M. Stein
**STANLEY M. STEIN, P.C.**
445 Fort Pitt Boulevard
Suite 150
Pittsburgh, PA 15219
Tel: (412) 904-4573
Fax: (412) 904-4726
Email: smstein@smsteinlaw.com

Stephen J. Fearon, Jr. (admitted *pro hac vice*)
**SQUITIERI & FEARON, LLP**
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
Email: stephen@sfclasslaw.com

*Counsel for Plaintiff and the Proposed Class*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and

the Class demand a trial by jury.

By: /s/Stanley M. Stein
Stanley M. Stein